UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

BARBARA J. MORROW,

                    Plaintiff,          Civil Action No.: 15-12851
                                         Honorable Linda V. Parker
                    v.             Magistrate Judge Elizabeth A. Stafford

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

                    Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS MOTIONS FOR SUMMARY JUDGMENT [R. 12; R. 15]

       Plaintiff Barbara J. Morrow appeals a final decision of Defendant

Commissioner of Social Security ("Commissioner") denying her application

for supplemental security income benefits ("SSI") under the Social Security

Act (the "Act"). Both parties have filed summary judgment motions,

referred to this Court for a Report and Recommendation pursuant to 28

U.S.C. § 636(b)(1)(B). The Court finds that the administrative law judge

("ALJ") violated the treating physician rule and thus **RECOMMENDS**:

- **GRANTING** Morrow's motion for summary judgment [R. 12];

- **DENYING** the Commissioner's motion [R. 15]; and

- **REMANDING** this case for further proceedings consistent with this

report and recommendation.

## I.    BACKGROUND

### A.    Morrow's Background and Disability Applications

Born in April 1964, Morrow was 48 years old when she applied for SSI benefits in September 2012.  [R. 9-5, Tr. 135].  Although there are no verifying records, Morrow has indicated that she dropped out of school in tenth or eleventh grade, that she was in special education from the fifth grade on, and that she cannot read, write or count.  [R. 9-2, Tr. 33-35; R. 9-6, Tr. 165; R. 9-7, Tr. 215, 231].  She has no past relevant work experience, having reportedly last worked in the 1980s at a cleaners.  [R. 9-2, Tr. 34].  Morrow's application alleged that she is disabled by bipolar disease and "psychophrenia," which the Court assumes was intended to refer to schizophrenia. [R. 9-6, Tr. 155].  She initially identified her onset date as being March 1, 1982, but amended it to September 18, 2012 after recognizing that she was not entitled to SSI benefits for time periods prior to her application. [R. 9-2, Tr. 27-28; R. 9-5, Tr. 150].

After a December 23, 2013 hearing, Morrow's application for benefits was denied in written decision on March 26, 2014.  [R. 9-2, Tr. 11-23]. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. [*Id.,* Tr. 1-6]. Morrow timely filed for judicial

2

review. [R. 1].

## B.    The ALJ's Application of the Disability Framework

A "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner determines whether an applicant is disabled by analyzing five sequential steps.  First, if the applicant is "doing substantial gainful activity," he or she will be found not disabled. 20 C.F.R. § 416.920(a)(4). Second, if the claimant has not had a severe impairment or a combination of such impairments[1] for a continuous period of at least 12 months, no disability will be found. *Id.* Third, if the claimant's severe impairments meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, the claimant will be found disabled. *Id.* If the fourth step is reached, the Commissioner considers its assessment of the claimant's residual functional capacity ("RFC"), and will find the claimant not disabled if he or she can still do past relevant work. *Id.* At the final step, the Commissioner reviews the claimant's RFC, age,

[1] A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  § 920(c).

3

education and work experiences, and determines whether the claimant could adjust to other work. *Id.*  The claimant bears the burden of proof throughout the first four steps, but the burden shifts to the Commissioner if the fifth step is reached. *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).[2]

Applying this framework, the ALJ concluded that Morrow was not disabled. At the first step, she found that Morrow had not engaged in substantial gainful activity since her amended alleged onset date. [R. 9-2, Tr. 13]. At the second step, she found that Morrow had the severe impairments of psychotic disorder, bipolar disorder, dependent personality disorder and substance abuse. [*Id.*, Tr. 13-14].  Next, the ALJ concluded that Morrow's severe impairments did not meet or equal the severity of the listed impairments.  [*Id.*, Tr. 14-15].

Between steps three and four, the ALJ found that Morrow had the RFC to perform a full range of work at all exertional levels, but with the nonextertional limitations of no climbing of ladders, ropes or scaffolds; no exposure to hazardous machinery or unprotected heights; only unskilled jobs with simple, routine tasks; no production-rate work or tandem tasks; no

---

[2] Opinions analyzing applications for Disability Insurance Benefits are applicable because the same standards apply to SSI claims.  *See* 20 C.F.R. §§ 404.1520 and 416.920.

contact with the general public; and only occasional contact with coworkers or supervisors.  [*Id.*, Tr. 15]. At the fourth step, the ALJ found that Morrow had no past relevant work. [*Id.*, Tr. 19]. With the assistance of VE testimony, the ALJ determined at step five that based on Morrow's age, education, work experience and RFC, she could perform the positions of dishwasher and cleaner.  [*Id.*, Tr. 19-20].  Thus, the ALJ found that Morrow was not disabled.

## II.   ANALYSIS

### A.

Pursuant to § 405(g), this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made in conformity with proper legal standards. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks and citation omitted). Only the evidence in the record below may be considered when determining whether the ALJ's decision is supported by substantial evidence. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007).

5

The significant deference accorded the Commissioner's decision is conditioned on the ALJ's adherence to governing standards. "Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings." *Gentry*, 741 F.3d at 723.  *See also Rogers*, 486 F.3d at 249. In other words, substantial evidence cannot be based upon fragments of the evidence, and "must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal quotation marks and citation omitted).

The Commissioner must also adhere to its own procedures, but failure to do so constitutes only harmless error unless the claimant has been prejudiced or deprived of substantial rights. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). On the other hand, substantial errors like ignoring evidence in the record or failing to follow the treating physician rule are not harmless. *Id.*; *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011); *Gentry*, 741 F.3d at 729.

Morrow argues that the ALJ failed to properly analyze Listing 12.05(C), ignored her illiteracy, erred in finding her back-problems to be non-severe, improperly weighed the opinion evidence and mischaracterized facts to find her not credible.  The Court finds that the ALJ

6

committed reversible error by failing to give good reasons for discounting the opinion of Morrow's treating physician, requiring remand.

**B.**

Prior to the hearing, psychiatrist Hyder Makki, D.O. examined and evaluated Morrow five times between April 2012 and August 2013. [R. 9-7, 227-28, 234-45, 262-66, 291-98]. Morrow saw Dr. Makki at Detroit Central City Community Mental Health, where case managers and non-medical therapists also serviced Morrow. [*Id.*, Tr. 215-26; 231-32, 246-47, 250, 267-87, 288-89, 299-302].

At Morrow's April 2012 examination by Dr. Makki, she wanted bipolar medication, having previously been prescribed Depakote (which treats bipolar mania), Risperdal (an antipsychotic) and Zoloft (an antidepressant). [*Id.*, Tr. 234-35]. She said that she had severe trouble sleeping, that she heard voices saying bad things to her, that she was afraid of people and felt that they are out to hurt her, and that she had a poor appetite. [*Id.*, Tr. 234]. A mental status exam revealed that she was alert; had an irritable and labile mood; had tangential, pressured but logical speech; was paranoid; suffered from auditory hallucinations; was restless and agitated; and had intact memory. [*Id.*, Tr. 236-37]. Morrow was diagnosed with

7

psychotic disorder, bipolar disorder with recent depression,[3] and alcohol abuse. [*Id.*, Tr. 239].  She was assessed a Global Assessment of Functioning (GAF) score of 42, which suggested serious impairment of function,[4] and a guarded prognosis. [*Id.*, Tr. 239, 241].

At Morrow's next visit with Dr. Makki, on August 10, 2012, he prescribed her Depakote and Saphris (an antipsychotic).  [R. 9-7, Tr. 242-44].  Her affect was reactive at this visit, but she otherwise had a normal presentation and denied hallucinations.  [*Id.*].  Morrow's symptoms and behavior were likewise unremarkable on November 14, 2012, when Dr. Makki again prescribed Depakote but substituted Seroquel (another antipsychotic) for Saphris.  [*Id.*, Tr. 227-30].

Yet on January 23, 2013, Dr. Makki reported that Morrow was again having severe trouble sleeping, was hearing voices saying bad things, was afraid of people and fearful that they would hurt her, and had a poor appetite.  [R. 9-8, Tr. 291].  She was irritable and labile, was restless and agitated, and had pressured and tangential speech, paranoid thought, and

---

[3]The report has a "rule out" notation next to the bipolar diagnosis, suggesting that this was a preliminary diagnosis.  [R. 9-7, Tr. 239].
[4] "The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below." *Norris v. Comm'r of Soc. Sec.*, No. 11-5424, 461 Fed. Appx. 433, 436 n. 1 (6th Cir. 2012)

auditory hallucinations.  [*Id.*, Tr. 293].  Dr. Makki diagnosed Morrow with bipolar disorder (most recently severely depressed), and alcohol abuse. [*Id.,* Tr. 295].  His diagnostic summary described Morrow as intellectually limited with a history of special education, as having a long history of mood swings with violent fights and explosive acting out, and as having hallucinations, paranoid delusions and depression starting in her teens. [*Id.,* Tr. 296].  Dr. Makki assessed a GAF score of 50, and again prescribed Depakote and Seroquel.  [*Id.*, Tr. 292, 295].

On August 27, 2013, Morrow, who had been running out of medication, presented with pressured and loud speech, had flight of ideation, escalated rapidly, and had a reactive affect and an irritable mood. [*Id.*, Tr. 262].  Her diagnosis and GAF were unchanged.  [*Id.*, Tr. 263-64].

Other personnel at Central City had recorded Morrow as having a hyper mood, loud and pressured speech, apparent impaired cognition, problems with reading and a history of special education, mood swings, a depressed mood, hallucinations, some noncompliance with medication due to excessive alcohol consumption, paranoia, a dislike of crowds, and verbal and physical aggression. [R. 9-7, Tr. 215, 231, 250; R. 9-8, Tr. 271-75, 286, 288-89, 299].  They also recorded Morrow as relying on them to understand basic information regarding her SSI application.  In November

9

2012, she turned to licensed professional counselor LaTanya Shelton to figure out why an envelope that she had sent to the Social Security Administration (SSA) had been returned to her. Shelton determined that the envelope did not have enough postage. [R. 9-8, Tr. 301-02]. The following month, Morrow arrived at Central City again confused because she believed that her appointment with the SSA was that day, but the materials that she had brought included both a letter establishing an appointment that day and a subsequent letter cancelling it. [*Id.*, Tr. 299-300]. Shelton explained what the letters meant and told Morrow that she needed to call for a new appointment; Shelton would arrange the transportation. [*Id.*]. (*See also id.*, Tr. 286, in which Shelton again discussed arranging transportation for Morrow in June 2013.)

## C.

Dr. Makki completed a form on Morrow's behalf entitled "Mental Impairment Questionnaire (RFC & Listings)," dated August 20, 2013. [R. 9-7, Tr. 258-260]. He identified her diagnosis as bipolar (most recently depressed) and psychosis, identified her present and past year GAF as 50, identified her prognosis as guarded and described Morrow as having often loud with pressured speech, flight of ideas and mood surges. [*Id.*, Tr. 258]. He opined that Morrow was unlimited in her abilities to understand and

10

remember short and simple instructions, be aware of hazards and take appropriate precautions, and adhere to basic standards of neatness. [*Id.*, Tr. 259-60]. She had limited but satisfactory abilities to carry out very short and simple instructions, and ask simple questions or request assistance. [*Id.*, Tr. 259].

However, according to Dr. Makki, Morrow had seriously limited abilities to maintain regular attendance and punctuality, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, set realistic goals, interact appropriately with the general public, maintain socially appropriate behavior and use public transportation. [R. 9-7, Tr. 259-60]. He opined that she was unable to meet competitive standards with respect to remembering work like procedures, maintaining attention for two hour segments, sustaining ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, making simple work-related decisions, completing a normal workday without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, responding appropriately to changes in a routine work setting, dealing with normal stress,

11

understanding and remembering detailed instructions and carrying out detailed instructions.  [*Id.*].

In the spaces provided for Dr. Makki to explain his opinions, he wrote that Morrow had problems with understanding and comprehending instructions; that she had be told exactly what to do and how to do it; that she was easily distracted and irritable with high stress, noise and too many people; that she was unable to accept criticism without becoming angry; that she needed assistance with goal setting; that she had problems with crowds and would not enter places with "high groups"; that she had loud speech and may curse out loud; and that she had a problem with public transportation in that she had paranoid thoughts about other bus riders. [*Id.*].

Since Dr. Makki was a treating psychiatrist, his opinion fell within the ambit of the rule requiring an ALJ to give controlling weight to a treating physician's opinions regarding the nature and severity of a claimant's condition when those opinions are well-supported by medically acceptable clinical and diagnostic evidence, and not inconsistent with other substantial evidence.  *Gentry*, 741 F.3d at 723, 727-29; *Rogers*, 486 F.3d at 242-43. When the disability is alleged to arise from a mental illness, the ALJ must show deference to a treater who is a trained mental health professional.

> [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (citations and internal quotation marks omitted).  *See also James v. Liberty Life Assur. Co.*, 582 F. App'x 581, 588 (6th Cir. 2014) (mental health professionals "typically treat symptoms that are subjective and just rely on a patient's subjective descriptions to evaluate and diagnose the patient.").

If an ALJ gives less than controlling weight to a treating source's opinion, she must provide "good reasons" for doing so that are "supported by the evidence in the case record, and … sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2); SSR 96–2p, 1996 WL 374188, at *5 (July 2, 1996)).  A treating physician's opinion is entitled to great deference in all cases.  *Gentry*, 741 F.3d at 723. The Court will "not hesitate to remand" when an ALJ's opinion "do[es] not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." *Cole,*

13

661 F.3d at 939 (internal quotation marks and citation omitted).

Here, the ALJ did not identify the weight that she gave to Dr. Makki's opinion or even refer to it as an opinion of a treating psychiatrist. [R. 9-2, Tr. 19]. She did not note Dr. Makki's diagnoses of bipolar disorder or psychosis, [*id.*], which was error; she was required to consider those diagnoses. *Blankenship*, 874 F.2d at 1121. Of further concern, after explicitly noting that Dr. Makki had opined that Morrow was significantly limited in thirteen areas, the ALJ only addressed two of them.

> [T]he claimant was opined to be seriously limited with interacting appropriately with others and using public transportation. The claimant's testimony and the medical records do not support these last areas though. In fact, the claimant reported no problems with using the city bus. And the claimant's medications are prescribed by her primary care physician.

[R. 9-2, Tr. 19]. Implicitly, the ALJ gave Dr. Makki's opinion limited weight, but she did not give good reasons for doing so.

First, the ALJ did not address a host of Dr. Makki's limitations. The Commissioner points out that the ALJ assessed an RFC limiting Morrow to unskilled work with simple, routine tasks, no production rate work and no contact with the public. [*Id.*, Tr. 15]. It is also true, as the Commissioner notes, that the ALJ limited Morrow to only occasional contact with coworkers and supervisors, [*id.*], but Dr. Makki opined that Morrow was

14

unable to sustain an ordinary routine without special supervision, [R. 9-7, Tr. 259-60], so occasional supervision is inconsistent with Dr. Makki's opinion.  Additionally, the ALJ did not address, either in her RFC or her analysis, Dr. Makki's opinion that Morrow was seriously limited or incapable of meeting standards with respect to regular attendance, punctuality, maintaining attention for two hour segments, making simple work-related decisions, completing a normal workday without psychologically based interruptions, performing work without unreasonable rest periods, accepting instructions and responding appropriately to criticism from supervisors or dealing with normal stress.  [*Id.*].  She was required to set forth good reasons for not incorporating these limitations, but her decision does not mention them at all.

Further, the ALJ's statement that Morrow "reported no problems with using the city bus" is simply not true.  The Commissioner cites Morrow as stating in the record that she had taken buses with required transfers and had indicated on her function report that she could take public transportation.  [R. 15, PgID 519, citing R. 9-2, Tr. 47-48; R. 9-6, Tr. 168]. But Morrow did report problems with riding buses; she testified that there were too many people on the bus and that she gets nervous around crowds and closed environments.  [R. 9-2, Tr. 40, 47-48].  She testified that

15

arranged transportation picks her up to take her to her psychiatric appointments, and Shelton's treatment notes corroborate that testimony. [*Id.*, Tr. 36; R. 9-8, Tr. 286, 299-300].

The ALJ also stated in a conclusory manner that the record and Morrow's testimony did not substantiate that she had difficulties interacting appropriately with others. But as summarized above, Dr. Makki and other providers at Central City described Morrow as being paranoid and afraid of people, violent and aggressive, hyper and loud. [R. 9-7, Tr. 215, 234, 250; R. 9-8, Tr. 262, 264, 271, 291, 293, 299]. In fact, in a field report, an SSA representative who conducted a face-to-face interview observed Morrow's difficulty with understanding, talking and answering, and reported, "[C]laimant shifted often and she [has] noticeable mental illness traits. [S]he talked very loud." [R. 9-6, Tr. 152]. If, despite this evidence, the ALJ believed that there was evidence in the record demonstrating that Morrow did not have difficulties interacting appropriately with others, she was required to provide sufficiently specific reasons for that conclusion. *Gayheart,* 710 F.3d at 375. She did not do so.

Finally, although Dr. Makki did represent in his August 2013 RFC assessment that Morrow's medications were prescribed by her primary care physician, [R. 9-7, 258], the actual treatment records show that he

16

prescribed Morrow's psychotropic medications while she received Vicodin and an unspecified blood pressure medication from her primary care physician.  [See R. 9-7, Tr. 228, 232, 243; R. 9-8, 263, 292].  Besides, the ALJ did not explain why she believed that the medications being prescribed by Morrow's primary care physician undermined the validity of Dr. Makki's opinion.

The ALJ did not identify the weight that she gave Dr. Makki's opinion, ignored numerous limitations set forth in Dr. Makki's opinion, and did not accurately describe the record.  Simply put, she did not give good reasons for giving less than controlling weight to Dr. Makki's opinion, and remand for reconsideration is warranted.

**D.**

Given the above recommendation, the Court will address the remainder of Morrow's objections in more summary fashion.

First, the ALJ erred in finding that it was "established" that Morrow's IQ scores in the mildly retarded range were invalid.  [R. 9-2, Tr. 14, citing R. 9-3, Tr. 87].  To render this finding, the ALJ relied upon records reviewer Rose Moten, Ph.D., who opined that Morrow's "[p]ast IQ scores in the [mildly retarded] range not felt valid."  [*Id.*].  But while a May 1999 psychologist who assessed Morrow's IQ found her results invalid because

17

she was intoxicated, [R. 9-7, Tr. 191-94], Hugh Bray, Ph.D., assessed

Morrow as having an IQ in the mildly retarded range in February 2004, and

opined that Morrow had "put forth valid effort." [*Id.*, Tr. 188-90].  Dr. Bray

concluded, "There is a 90% confidence interval of her full scale IQ between

56 and 64.  Her working memory is in the impaired range."  [*Id.*, Tr. 189].

The general rule is that an examining source's opinion is entitled to more

weight than non-examining sources. *Miller v. Comm'r of Soc. Sec.*, 811

F.3d 825, 834 (6th Cir. 2016); § 416.927(c)(1).  The ALJ did not mention

Dr. Bray's opinion or explain why she effectively gave controlling weight to

the opinion of a records reviewer, relying upon that opinion to declare that it

was "established" that Morrow's IQ scores were invalid.

Nonetheless, Morrow does not meet her burden in establishing that

her impairments meet or medically equal Listing 12.05(C).  *Forrest v.*

*Comm'r of Soc. Sec.*, 591 Fed. Appx. 359, 366 (6th Cir. 2014) (claimant

bears burden of demonstrating that impairments met or equal a listing).

"To satisfy Listing 12.05(C), a claimant must demonstrate: (1) valid verbal,

performance, or full scale IQ of 60 through 70; (2) evidence of deficits in

adaptive functioning initially manifested before age 22; and, (3) an

additional and significant work-related limitation of function." *Ware v.*

*Colvin*, No. 5:13-CV-00991, 2014 WL 584752, at *4 (N.D. Ohio Feb. 12,

18

2014).  As noted, Dr. Bray found that Morrow had an IQ within the range of 56 and 64, and Morrow alleges that her back pain constitutes an additional work-related limitation of function.  However, Morrow has presented no evidence that she had deficits in adaptive functioning that initially manifested before age 22.  The applicable regulation describes adaptive activities as including "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office."  § 12.00(C)(1).  Although Morrow has testified that she was in special education classes and dropped out of school by the 11th grade, she has presented no evidence that addresses her ability to perform the activities described in Section 12.00(C)(1) prior to her turning 22 years old.

Besides that, the Court does not agree that the ALJ erred in failing to find that her back pain was a severe impairment.  A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." § 920(c). Morrow bears the burden of presenting medical evidence that supports the claimed severe impairments; a diagnosis alone is insufficient. *Bowen v. Yuckert*, 482 U.S. 137, 146, (1987); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir.1988).  Her medical record shows that she has been diagnosed with chronic back pain and

19

lumbago, and prescribed Vicodin since at least June 2012. [R. 9-7, Tr. 252, R. 9-9, Tr. 311-15, 318, 323, 329-44, 347]. But those same medical reports routinely described Morrow's back as having a normal curvature and no tenderness, [*id.*], and a musculoskeletal examination revealed no pain in the muscles or joints, no limitation in her range of motion, no paresthesia and no numbness. [*Id.*, Tr. 339-40]. In addition, Morrow did testify that she was capable of long bike rides, planting in a garden, laundry, dishes, vacuuming, dusting, making up the bed, raking and mowing her lawn. [R. 9-2, Tr. 54-56]. She has not met her burden of demonstrating that her back pain severely limits her ability to perform basic work activities.

Finally, the Court agrees with Morrow that the ALJ should have addressed her alleged illiteracy. 20 C.F.R. § 416.964 (describing education and literacy as a vocational factor). The Commissioner points out that Morrow's attorney did question the VE about the impact that illiteracy would have on her ability to work, and the VE testified that janitorial and housekeeping jobs would still be available. [*Id.*, Tr. 63-64]. While true, the ALJ should on remand reassess Morrow's RFC and credibility after properly evaluating Dr. Makki's and Dr. Bray's opinions, as well as her claim of illiteracy.

### III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Morrow's

motion [R. 12] be **GRANTED**, the Commissioner's motion [R. 15] be

**DENIED**, and the Commissioner's decision be **REMANDED** for further

proceedings consistent with this report and recommendation.

<div align="right">

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

</div>

Dated: August 17, 2016

### <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Either party to this action may object to and seek review of this

Report and Recommendation, but must act within fourteen days of service

of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ.

P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any

further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v.*

*Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*,

638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but

fail to raise others with specificity will not preserve all objections that party

might have to this Report and Recommendation.  *Willis v. Secretary of*

*HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers*

*Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection

must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains.  Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 17, 2016.

<div style="margin-left:40%">
s/Marlena Williams
MARLENA WILLIAMS
Case Manager
</div>